## UNITED STATES DISTRICT COURT
## DISTRICT OF RHODE ISLAND

### CASE NO.  1:24-cv-172

_____
)
SECURITIES AND EXCHANGE COMMISSION,   )
)
Plaintiff,   )
)
v.   )
)
AHMED ALOMARI and   )     **<u>JURY TRIAL DEMANDED</u>**
MCM CONSULTING,   )
)
)
Defendants.   )
)
_____)

### <u>COMPLAINT</u>

Plaintiff Securities and Exchange Commission ("the Commission") alleges the following

against defendants Ahmed Alomari ("Alomari") and MCM Consulting ("MCM Consulting"):

### <u>INTRODUCTION</u>

1.      The Commission brings this action against stock promoter Alomari and MCM

Consulting, the entity through which Alomari operates his business and holds his personal

investments, for touting, fraudulently recommending while selling stock without adequately

disclosing the intent to sell, and other violations related to his stock promotion services.

Alomari is a self-described social media marketing guru who was hired and compensated to

promote the stock offerings of at least five companies that were "microcap stocks."  Some of

these companies had stock that traded for prices less than $5 per share, which are commonly

known as "penny stocks."

2.      Microcap stocks are those with a market capitalization of less than $250 to $300

million.  Microcap companies typically have limited assets and operations.  They often have

products and services that are still in development or have yet to be tested in the market.  Their

stocks tend to be low priced and trade in low volumes, making their prices subject to high volatility – meaning their prices could have large swings up or down based on the volume of trading activity.

3.     Some microcap companies pay stock promoters to recommend or "tout" stock in unsolicited electronic communications, such as emails, texts, social media posts or internet chatrooms.  The Federal securities laws require the publishers to disclose who paid them for the promotion, the amount, and the type of payment.

4.     From at least March 2019 and continuing to February 2022, Alomari used such outlets as Twitter, Instagram, Facebook, and investor chatrooms to promote at least five microcap stocks without disclosing the source or amount of his compensation.

5.     Alomari not only touted these stocks without proper disclosures, but also acquired a substantial number of shares in some of the companies which he surreptitiously sold at the time of his recommendations.  For example, Alomari personally invested in two initial public offerings (IPOs) which he was hired to promote.  An IPO generally refers to when a company first sells shares of its stock to the public.  IPOs of all but the smallest of companies are offered to the public through an underwriter, a firm that agrees to purchase the shares from the issuing company and then sell the shares to investors.  The underwriter in consultation with the company decides on the basic terms and structure of the offering well before trading starts, including the percentage of shares sold to persons prior to the IPO – called allocations or subscriptions. Underwriters typically sell allocations or subscriptions to institutional and wealthy investors who are better able to buy large blocks of IPO shares, assume the financial risk, and hold the investment for the long term.

6.     Alomari subscribed to the IPOs of two issuers, while also being hired to promote the stock around that time.  Stocks are susceptible to dramatic price movements in the first few days of public trading given their stock prices are unsettled and the possibly heightened interest

in new companies, especially where hype is created around them.  In fact, one of the two stocks in which Alomari bought IPO shares – and promoted – increased by over 500% in just its first day of trading.  While promoting these two IPOs, Alomari quickly sold his entire IPO positions for at least $1.4 million in profits without disclosing to the public his actual or intended sales.

7.      After the IPOs, Alomari continued to recommend the purchase of the stocks to the public at times when he was selling his personal holdings in those stocks.  Alomari also was able to publicly sell shares he had earned from his promotional services based on false representation letters as to the shares being available for public trading.

8.      Alomari conducted his stock promotion business through MCM Consulting, an entity he formed in 2019.  Alomari entered "consulting agreements" with the issuers and opened brokerage accounts in the name of MCM Consulting.  When Alomari received stock as payment for his promotional services, the shares were delivered to the MCM Consulting brokerage accounts, and Alomari thereafter sold the shares to the public using those same accounts.

9.      Alomari used his wife as a front for MCM Consulting.  Alomari installed his wife as the purported sole officer and director of MCM Consulting and directed her to sign an array of documents in connection with his stock promotional services and compensation, including broker deposit forms and false representation letters.  Alomari purported to be just an "authorized signer" for his wife's entity, but in reality he controlled all of MCM Consulting's operations and transactions.

10.     Alomari and MCM Consulting violated Sections 5(a), 5(c), 17(a), and 17(b) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), 77q(a), 77q(b)]  and Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].  Alomari is also liable under Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)] with respect to violations of the Exchange Act.  The Commission seeks injunctive relief against Defendants, disgorgement of ill-gotten gains and

prejudgment interest thereon, civil money penalties, an order preventing Defendants from engaging in transactions in penny stocks, and an order preventing Alomari from acting as an officer or director of an issuer of a class of securities registered with the Commission.

## DEFENDANTS

11.     Ahmed Alomari, age 39, is a resident of Cranston, Rhode Island.  Alomari is the 100% owner of MCM Consulting.

12.     MCM Consulting is a Wyoming corporation with its principal place of business in Cranston, Rhode Island.  MCM Consulting was incorporated in March 2019.  In April 2019, Alomari's wife was named the sole officer and director of MCM Consulting.  Per corporate filings as of January 2024, Alomari's wife maintains those positions.  However, at all material times, Alomari has been the 100% owner of MCM Consulting and controls all its operations and assets.

## RELATED PARTIES

13.     Kevan Casey, age 52, resides in Houston, Texas.  Casey is self-employed.  Casey had "consulting agreements" with Soliton, Inc., CNS Pharmaceuticals, Inc. and Volcon, Inc. by which he provided services related to the public markets for those stocks.  Entities controlled by Casey were also pre-IPO shareholders of Soliton, Inc. and CNS Pharmaceuticals, Inc.  Entities controlled by Casey were also pre-IPO and IPO shareholders of EBET, Inc. and Volcon, Inc.

14.     Adrian James, age 49, resides in Austin, Texas.  James is the co-founder and a director of Volcon, Inc. and had "consulting agreements" with Soliton, Inc. and CNS Pharmaceuticals, Inc. by which he provided services related to the public markets for those stocks.  Entities controlled by James were also pre-IPO shareholders of Soliton, Inc. and CNS Pharmaceuticals, Inc.

15.     Soliton, Inc. ("Soliton") was a medical device company incorporated in Delaware and headquartered in Houston, Texas.  Its common stock was registered with the Commission

pursuant to Section 12(b) of the Exchange Act and traded on the Nasdaq under the "SOLY" symbol or ticker (a set of capital letters assigned to a security for trading purposes). Soliton commenced public trading at $5.00 per share in February 2019 with a market capitalization of approximately $73 million. Soliton was acquired by AbbVie, Inc. on December 16, 2021, and the registration of its common stock was terminated on December 28, 2021.

16.    CNS Pharmaceuticals, Inc. ("CNS") is a clinical-stage pharmaceutical company incorporated in Nevada and headquartered in Houston, Texas. Its common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and trades on the Nasdaq under the "CNSP" symbol or ticker. CNS commenced public trading at $4.50 per share in November 2019 with a market capitalization of approximately $62.8 million. CNS currently trades for approximately $0.21 per share with a market capitalization of approximately $2.31 million.

17.    EBET, Inc. fka Esports Technologies Inc. ("EBET") is an online gambling platform operator incorporated in Nevada and headquartered in Las Vegas, Nevada. Its common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act and is traded on OTCQB (whose parent company is OTC Markets Group Inc.) under the "EBET" symbol or ticker after being delisted from the Nasdaq. EBET commenced public trading at $6.00 per share in April 2021 with a market capitalization of approximately $62.4 million. EBET's stock currently trades for approximately $0.26 per share with a market capitalization of approximately $3.9 million.

18.    Volcon, Inc. ("Volcon") is an electric off-road vehicle design and sales company incorporated in Delaware and headquartered in Round Rock, Texas. Its common stock is registered with the Commission pursuant to Section 12(b) of the Exchange Act and is traded on the Nasdaq under the "VLCN" symbol or ticker. Volcon commenced public trading at $5.50 per share in October 2021 with a market capitalization of approximately $62.4 million. Volcon

stock currently trades for approximately $0.25 per share with a market capitalization of approximately $4.7 million.

19.    TAAT Global Alternatives, Inc. ("TAAT Global") is a cigarette-alternative production company incorporated and headquartered in Vancouver, Canada.  Its common stock is traded on OTCQB (whose parent company is OTC Markets Group Inc.) under the "TOBAF" symbol or ticker.  TAAT Global currently trades for approximately $0.15 per share with a market capitalization of approximately $1.8 million.

## JURISDICTION AND VENUE

20.    This Court has subject-matter jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78aa].

21.    This Court has personal jurisdiction over Defendants because Alomari resides in this District, MCM Consulting's principal place of business is in this District, and both Alomari and MCM Consulting conducted business related to the allegations herein in this District.

22.    Venue lies in this District pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because Alomari resides in this District, MCM Consulting's principal place of business is in this District, and both Alomari and MCM Consulting have transacted business here.

23.    In connection with the conduct alleged in this Complaint, Defendants, directly and indirectly, singly or in concert with others, made use of the means or instruments of transportation or communication in interstate commerce and of the mails.  As detailed below, the conduct alleged in this Complaint involved deliberate or reckless disregard of regulatory requirements.

## FACTUAL ALLEGATIONS

### A. Alomari's Background

24.     Under such names as "GMoney," "Prime Time Media" and "Millionaire Media," Alomari claimed to be a self-made marketing millionaire with millions of followers across celebrity gossip websites and social media feeds.

25.     After years of purported success in the social media market, in or about early 2019, Alomari ventured into the stock promotion business.  To do so, Alomari used several social media accounts on Twitter (Marijuana Stocks, IBuyCheapStocks, CheapStocksUs), Instagram (Penny Stock Advice), Facebook (GMoney, Lisa Raye, MMJ Lovers, Nasdaq Stocks), and stock-related websites (Nasdaqstocks.com and MMJstocks.com).

26.     Alomari has conducted his stock promotional activities through several means, including: (1) Twitter; (2) Facebook; (3) Instagram; (4) the Investors Underground public chat room; (5) Alomari's www.nasdaqstocks.com website; and (6) "Nasdaq Stock Alerts" text blasts to a list of phone numbers maintained by Alomari.

27.     For example, Alomari posted frequently on Investors Underground, a message board open to the public for a fee, under the name "ibuycheapstocks."

28.     Alomari also disseminated "NasdaqStock Alerts" via a third-party text messaging service such that individuals receive text blasts from an unidentified number.  Some of those text blasts had links to nasdaqstocks.com postings, some had links to press releases, and others had no links.

29.     Alomari initially used his Millionaire Media entity for his new stock promotion services, but soon transitioned all his activities to the newly formed MCM Consulting in or about April 2019.  Alomari has owned 100% of MCM Consulting, but named his wife as the sole officer and director of MCM Consulting.  However, his wife has no substantive involvement in

MCM Consulting's business and investments, except signing documents at Alomari's direction. In other words, Alomari controls all of MCM Consulting's operations and activities.

**B.  Alomari Is Hired to Promote Several Issuers for or Soon after IPOs**

30.     In March 2019, Alomari was approached by Casey and James, two acquaintances through whom Alomari had previously invested in a microcap pharmaceuticals company, to promote the stock of Soliton, a microcap medical device company.

31.     On March 6, 2019, Casey emailed Alomari, copying James, proposing $10,000 to be paid by Soliton and some form of stock compensation in return for Alomari agreeing to "[i]ntroduce the company to all of your twitter, email and social media contacts," "Message board posts – ongoing basis," and "Social media outreach."  On March 8, 2019, Alomari (at Casey's direction) sent Soliton a $10,000 invoice for marketing to his "investor database for 60 days" and "exposure to our 100M verified Celebrity Network followers on Facebook and Twitter Accounts (11,000 Followers)."

32.     On March 8, 2019, Alomari began promoting Soliton on Twitter.  Alomari coordinated the promotion with James by private chat, asking James to "[g]ive me three competitor tickers" and other content.  Alomari then sent James a screenshot of a tweet (with competitor tickers) from Alomari's IBuyCheapStocks account: "$SOLY interesting concept. Sexy theme w ultra low float Looking to swing this 1-2 months personal target $7+ #stocks $TRIL $MBOT $DCAR $ADIL;" while Soliton stock was trading below $5 per share.

33.     In stock equities, a "float" refers to the number of shares available for public trading.  As noted above, microcap companies typically trade in lower volumes with fewer shares outstanding (in other words, a "low float"), making their prices subject to larger price swings based on trading activity.

34.     Later that afternoon, Alomari messaged James suggesting responsibility for creating buying activity, saying: "Quick $200k in 100% PURE buying today."

35.     On March 12, 2019, Alomari tweeted again about Soliton as "Multi Billion dollar market Ultra low float could rip $7-10+ easy," while Soliton was publicly trading below $5 per share.

36.     Casey and James' initial proposal to Alomari on behalf of Soliton also included compensation in the form of stock to be determined.  Casey first offered "$10,000 from the company [and s]eparately, Adrian and/or I will sell you $25,000 in stock" for $100.  Alomari eventually signed a "Consulting Agreement" on behalf of MCM Consulting effective April 29, 2019 "for an initial term ending August 31, 2019."

37.     Under the Consulting Agreement, MCM Consulting would receive 25,000 shares from Soliton in return for promoting the stock "on platforms controlled by" MCM Consulting (*i.e.*, Alomari).

38.     Casey and/or James next arranged for Alomari to promote the IPOs of several other issuers: CNS, EBET, and Volcon.  Alomari was compensated by each of these issuers through the issuance of shares and/or warrants pursuant to written Consulting Agreements with MCM Consulting similar to the Soliton agreement.  And, for each issuer, Alomari published promotional electronic communications about their stocks that failed to include full disclosure of his compensation as required by law.

39.     Alomari was separately hired to promote a fifth issuer, TAAT Global.  In January 2021, Alomari was first hired by a TAAT Global shareholder to promote TAAT Global per a Consulting Agreement with MCM Consulting as a "social media and business strategy expert with a large social media following and key strategic relationships."  The agreement had an "initial term of three months," and MCM Consulting was compensated with "50,000 non restricted free trading shares of TAAT's common stock."

40.     MCM Consulting also entered a "Corporate Advisor Agreement" with TAAT Global effective as of February 1, 2021.  MCM Consulting received a "one-time advisory fee of

$60,000" for services including "coverage of all company news releases on social media channels as well as dissemination to MMJ Stocks email/sms subscribers."  On January 31, 2021, Alomari sent TAAT Global an invoice for the $60,000 due under the agreement, describing the services to include "Company exposure to our social media network of 10 Million Marijuana Enthusiasts/Verified Celebrity Fans" and "Company exposure to high profile Chatrooms."

41.    Alomari started promoting TAAT Global the same day as the date of the invoice to TAAT Global.  For example:

| Date | Channel | Content |
|---|---|---|
| 1/31/2021 | Twitter Facebook Instagram | Stock probably goes crazy on Monday |
| 1/31/2021 | Text Blast | We STRONGLY feel that TAAT can be one of our ALL TIME GREAT Alerts. Astute Investors Will Be In.  WILL YOU? |
| 2/2/2021 | Twitter | Our Alert on $TAAT $TOBAF is just getting started.  Shorts tried to use a hit piece to bring it down but you CAN'T fake fundamentals and $TAAT management continues to execute! |
| 2/3/2021 | Text Blast | could be on the verge of a MAJOR Short Squeeze Stay Tuned! |
| 2/3/2021 | Facebook | Just a matter of time before this stock blows up and never looks back. |
| 2/3/2021 | Twitter | Our Top Alert of 2020 and 2021…this will end up going viral in the coming month/year as the $BYND of cigs…One to tuck away imo |

42.    Alomari sent screenshots of several of these promotions to the TAAT Global shareholder with whom MCM Consulting entered the Consulting Agreement dated January 15, 2021.  Alomari did not disclose his compensation either under the Consulting Agreement or Corporate Advisor Agreement in any of these promotions.

43.    Later, in February 2022, TAAT Global again compensated Alomari (via MCM Consulting) for promotional services.  On or about February 1, 2022, MCM Consulting sent TAAT Global an invoice for $100,000 in return for services including "Social Media Market Awareness" and "MMJ Stock/NasdaqStocks Database Distribution."  Later that month, Alomari posted an article on Nasdaqstocks.com titled "[TAAT Global]: The Revolutionary Nicotine & Tobacco Free Company Creating Healthier Profits For Investors."  The article did not contain a

disclosure of MCM Consulting being paid $100,000 by TAAT Global earlier that month for such promotional work.

44.    Alomari was compensated for his promotional work on each issuer.  However, Alomari overwhelmingly failed to disclose his compensation. He disclosed the existence of compensation on just a small fraction of his promotional materials across all these issuers despite being aware both how and when to disclose his compensation.  Specifically, only six articles on Alomari's Nasdaqstocks.com website about Soliton, and one article each about CNS and TAAT Global, contained disclosures of compensation.  Some of his text blasts contained links to these articles.  Most of these few, isolated disclosures, however, contained inaccurate information as to the source and amount of his compensation.

45.    Except for the eight website articles and linked texts, Alomari's promotions – including all his tweets, all his chatroom posts, all his Facebook and Instagram posts, and several of his text blasts – had no disclosure of compensation or relationship with the issuer.  Alomari merely had the following generic uninformative disclosure on his Twitter profile homepage: "Make your OWN trading decisions. I could be buying or selling any stocks mentioned."

46.    None of Alomari's promotions of EBET or Volcon contained any disclosure of compensation or any relationship with the company.

**C.  Alomari Invests in Two IPOs and Immediately Sells Amid His Promotions**

47.    Alomari was not merely a compensated stock promoter for the issuers. He also personally invested substantial sums in the securities of these companies.  Alomari approached Casey and James to invest personally in some of the issuers they were preparing to go public while being hired to provide promotional services.  For example, Alomari personally invested heavily in the IPOs of EBET and Volcon in April and October 2021, respectively.

48.    MCM Consulting entered a "Consulting Agreement" with EBET effective October 19, 2020, with an "initial term of six months" and compensation in the form of 50,000 restricted shares.

49.    On April 5, 2021, Alomari invested $200,000 of his own money in EBET's IPO, by which he was allocated 33,333 shares at the IPO price of $6.00 per share.  By subscribing to the IPO, Alomari obtained the shares at a set price pursuant to a registration statement filed with the Commission.  The shares were then available for public sale by Alomari in the open market.  Whereas Alomari obtained the shares at the fixed IPO price, the shares could then be resold at prevailing market prices.

50.    Alomari performed a variety of promotional services leading up to the EBET IPO and on the first days of public trading to try to boost market demand, including a chatroom post two weeks before the IPO that "EBET IPO going to be a huge one imo."  In the days leading up to the IPO, Casey and an associate of Casey communicated with Alomari for Alomari to promote EBET stock surrounding the IPO.  On April 2, 2021, Casey and the associate introduced Alomari to EBET to ask for content Alomari could use for his promotions.  On April 9, 2021, a few days after Alomari sent in his money for his IPO shares, Alomari texted Casey's associate on EBET: "Are we all clear for the IPO [next week]?  I want to time things accordingly."  Casey's associate responded: "Looking more like [April 15]."  On April 14, 2021, the eve of the IPO, Casey sent Alomari a link to a press release of EBET's IPO announcement.  Alomari responded: "Ok let's f__ing go."  Casey replied: "Yepper."

51.    The EBET IPO was priced – and Alomari bought his shares – at $6.00 per share.  On April 15, 2021, the first day of public trading, Alomari posted five times about EBET on Twitter and 8 times on Investors Underground.  None of his posts disclosed that he had signed a Consulting Agreement with EBET or his compensation thereunder.

52.    On that first day of public trading, several of Alomari's posts stated he was buying shares and, throughout the day, compared EBET to another issuer (UTime Ltd., ticker UTME) with an IPO the previous week where the shares spiked 875% on the first day of trading. For example:

| Time on IPO Day | Alomari's Chatroom Post |
|---|---|
| 9:27am | Watching EBET carefully this am 2m float very high demand sexy space same bankers as UTME |
| 10:23am | EBET looking like UTME all over again crazy |
| 3:40pm | EBET approaching HOD's eerily similar to UTME pull up a 60 min chart first 2 days |

53.    Alomari did not disclose that he was a paid promoter for EBET, had subscribed to its IPO, or that his buying activity was dwarfed in size by a selloff in which Alomari sold all his IPO shares (plus 6,549 shares in a separate brokerage account he had bought on the IPO day) that same day for $1,324,336 – a profit of $942,500.  Back on Twitter at the end of the IPO day, the owner of Investors Underground tweeted: "Great call this AM $EBET @CheapStocksUs crushed the call in the room pre market wouldn't have made my radar otherwise."

54.    In October 2021, Alomari paid $720,000 to subscribe to 130,909 shares in the Volcon IPO.  Months earlier, MCM Consulting entered a "Consulting Agreement" with Volcon for 75,000 restricted shares in return for promotional services.  The agreement had a "term of six (6) months post-IPO," and stated that MCM Consulting would "provide public market consulting services" in return for a warrant to purchase 7,752 Volcon shares for $0.01 per share (the IPO was priced at $5.50 per share).

55.    Two days before the IPO, on October 4, 2021, Alomari texted James, a founder and director of Volcon: "Please send me everything you have for VLCN we need distributed on social and to key investors."  James responded: "I'll have a bunch of videos for you tomorrow morning," to which Alomari replied: "Perfect exactly what I need."

56.     The next day, on the eve of the IPO on October 5, 2021, Alomari texted James: "OK it's showtime it's time to start distributing stuff send me as many videos and interesting things as possible….as long as at least 1-2 hours before close."  Later in the day, after James sent Alomari six links to Volcon product photographs, Alomari texted James: "I've already crushed it just w the sec link alone bro.  So much chatter in chats on [Instagram] etc. . . .  My book already knows about it/chats.  Then last Twitter."  Later that evening, Alomari texted James: "Everything lined up on my end for tomorrow congrats bro.  Going to be great."

57.     The same day, Alomari tweeted about Volcon: "Diff is there is a theme and it's a REAL business.  And note the structure.  Very tight.  Most important things."  Meanwhile, in a private text that same day, Alomari wrote: "This [Volcon] is just a 1-5 day hold for us max."

58.     On the morning of the IPO on October 6, 2021, Alomari posted on Investors Underground that he was going to buy Volcon shares: "Let [the IPO investors] dump [their] shares...accumulate is my game plan...They are known pikers they are happy with 1-3 a share...Soon as they are done [in my opinion] VLCN is going to rip hard."  Unbeknownst to his readers, Alomari had already bought shares in the IPO and was intending to sell all his Volcon shares.

59.     The same day, Alomari tweeted: "If $15 breaks [the IPO price was $5.50] we are looking at round 2 [all-time highs]/tomorrow continuation $VLCN watching closely."  Later that day, the operator of the IncredibleTrades chatroom tweeted: "$VLCN another nice win for our members today! $7.50 to $15.50. Thanks @CheapStocksUs for the IPO alert!"

60.     Through October 19, 2021, Alomari continued to post about positive Volcon news and the stock hitting multiple new daily highs, "ripping," and "starting to go again."  Alomari did not disclose that, between October 7 (the day after the IPO) and October 19, 2021, he had sold all his IPO subscription shares for a profit of $478,000.

61.     Alomari also promoted the stock of CNS at and after its IPO.  Casey approached Alomari in 2019 to promote the stock of CNS.  Alomari signed a consulting agreement with CNS effective April 11, 2019, for 75,000 shares in return for promotional services "for an initial term of twelve months from the date of this Agreement."

62.     CNS began public trading on November 12, 2019, at less than $5.00 per share. On November 19, 2019, Alomari sent two text blasts about CNS, including: "[CNS] has been on fire for members.  We brought CNSP to you at $4.50 [the IPO price] it is now $5.68 in less than a week!  Stay Tuned for More Updates!"  Alomari did not disclose his "consulting" arrangement with or compensation from CNS in these text blasts.

63.     Later, on March 23, 2020, Alomari sent out a text blast and posted on Investors Underground: "CNS low float might move.  CNSP starting to move off that COVID PR."  Again, Alomari did not disclose his "consulting" arrangement with or compensation from CNS.

**D.  Alomari Obtains and Immediately Sells Soliton Shares Subject to Restriction**

64.     Alomari also found ways to receive – and immediately sell – purportedly unrestricted Soliton shares he received in consideration for his ongoing promotional services.

65.     Generally, the Federal securities laws make it unlawful for any person to offer or sell securities unless such offering or sale is registered with the Commission or is exempt from registration under Commission rules.  This general rule applies to offerings or sales made by the company issuing the securities as well as any resales of those securities.

66.     Securities acquired directly or indirectly from a company that issues stock in a transaction, or a chain of transactions, that does not involve any public offering is considered "restricted."

67.     Commission Rule 144 creates a safe harbor from the registration requirement for persons seeking to resell securities that are not otherwise exempt from the registration requirements.  The Rule imposes certain threshold requirements, including a holding period of

six months to a year, depending on whether the company makes certain reports to the Commission. These holding periods serve to restrict stock sales and prevent holders from immediately dumping their stock into the public market.

68.    If the person acquiring the stock takes the stock by purchase, the holding period does not begin until the full purchase price is paid or given by the person acquiring the stock from the company.

69.    Effective April 29, 2019, Alomari signed a Consulting Agreement with Soliton to receive 25,000 shares in return for promotional services through August 2019. Because Alomari received these shares directly from Soliton, they were restricted securities subject to holding period requirements.

70.    Within a week of the effective date of his Consulting Agreement, Alomari told Casey and James that he needed immediate funds and was unable to sell his Soliton shares because they would remain restricted for months.

71.    To help Alomari sell Soliton stock for cash, on or about May 7, 2019, Casey and James agreed in writing to immediately transfer 22,000 unrestricted shares to Alomari in exchange for Alomari's transfer of the right to acquire the 25,000 restricted shares in November 2019 at $0.05 per share. On May 7, 2019, the market value of Soliton stock was approximately $11 per share.

72.    The 22,000 unrestricted shares represented Alomari's compensation for services under MCM Consulting's agreement with Soliton. In other words, Alomari received the 22,000 unrestricted shares for his services under the Consulting Agreement in lieu of the 25,000 restricted shares, which he effectively sold to Casey and James at a deeply discounted price of $0.05 per share.

73.    Between May 30 and June 5, 2019, Casey and James each transferred 11,000 shares to Alomari, who publicly sold all the shares within one day of depositing them in his

brokerage account for approximately $400,000.  On May 29, 2019, the day before he sold all 11,000 shares transferred by Casey, Alomari published a promotional article on his Nasdaqstocks.com website disclosing he had been "compensated $10,000 and 25,000 shares of restricted stock by Soliton, Inc. for a period beginning March 8, 2019 and ending June 8, 2019." Alomari's posting did not disclose he had exchanged those shares for 22,000 unrestricted shares he was intending to sell.

74.    Two months later, on or about August 9, 2019, Casey approached Alomari to perform more promotions on Soliton.  Alomari felt he had performed all the services under the Consulting Agreement in return for the 22,000 unrestricted shares previously transferred to him by Casey and James.  Alomari told Casey and James that he would have to be additionally compensated for any future services.  Specifically, Alomari asked Casey and James for their agreement to sell back their right to acquire those 25,000 restricted shares at $0.05 per share in exchange for Alomari's promotion of Soliton starting as of August 9, 2019.  Casey and James agreed.  On August 9, 2019, the market value of Soliton stock was approximately $9 per share.

75.    The parties did not specify an end date for the promotional services.  On the following day, August 10, 2019, James asked Soliton executives to give Alomari access to Soliton materials for distribution "to his database."  Two days later, on August 12, 2019, Alomari sent at least three text blasts, including: "Congratulations Our Alert on SOLY this morning @ $8.80 hit a intraday high of $12.19 today!  Keep Your Eyes On SOLY over the next couple of weeks!"  Those texts provided no disclosure of Alomari's compensation for promotional services.

76.    Alomari frequently chatted with Casey and James amid his continued promotion of Soliton stock in 2020.  For example, on July 6, 2020, Alomari tweeted (with no disclosure of compensation): "$SOLY MAJOR BOUNCE Potential and buyout target."

77.    On September 11, 2020, Alomari texted Casey and James "About to give SOLY a little nudge." An hour later Alomari texted Casey and James screenshots of multiple tweets and Investors Underground posts he had made (with no disclosure of compensation), including "Personal Target $10-12+ near term" when the stock traded under $7 per share.

78.    On October 19, 2020, Alomari sent Casey and James screenshots of Twitter, Instagram and Investors Underground posts promoting Soliton telling them: "We're very close guys." The Instagram post stated (without disclosure of compensation): "Your boy #PennyStockAdvice always does right by you! $9.30 and climbing. Multi month break out. 200 ma test if we build above we're looking at $10-12 fast. 2.2m shares are short and FDA and other catalysts are coming. Squeeze time. W[ith] approval could see $15++." The following day, Alomari texted Casey and James: "SOLY protected…Can run now."

79.    Starting in November 2019, Alomari sought to deposit and publicly sell the 25,000 shares issued by Soliton that Casey and James sold to Alomari in return for promotional services starting in August 2019. To issue the shares without restrictive legend, the transfer agent needed instructions from the issuer and/or a legal opinion letter that the shares were eligible for public trading.

80.    Alomari did not disclose to Soliton or its counsel or transfer agent that he had previously agreed to receive 22,000 shares from Casey and James for the services performed under the Consulting Agreement. Nor did Alomari disclose to Soliton or its counsel or transfer agent that Casey and James had agreed to sell their right to the 25,000 shares at $0.05 per share in return for Alomari performing promotional services starting in August 2019.

81.    In fact, Soliton released the 25,000 shares subject to Alomari's August 2019 agreement with Casey and James in tranches from November 2019 to March 2020 in reliance on representation letters signed by Alomari's wife at Alomari's direction on November 21, 2019, December 26, 2019, January 30, 2020, and March 2, 2020. Those letters falsely stated that the

shares "are fully paid and a minimum of six months has elapsed since the date the shares were acquired from the Issuer or an affiliate thereof as described in Rule 144." In fact, contrary to that representation, Alomari had only begun to perform the services that were his consideration for the stock in August 2019 and he was continuing to promote Soliton.

82.    Each time he received a tranche of shares from Soliton, Alomari deposited the shares in an MCM Consulting brokerage account and immediately sold the shares in the open market. The total proceeds from the sales of these 25,000 shares were approximately $265,000.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Violation of Section 17(a) of the Securities Act

83.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-82 above.

84.    By reason of the foregoing, each of Alomari and MCM Consulting, directly or indirectly, acting intentionally, knowingly, recklessly, or negligently, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities: (a) has employed or is employing devices, schemes, or artifices to defraud; (b) has obtained money or property by making untrue statements of material fact or omitting material facts necessary to make the statements made not misleading; and (c) has engaged or is engaging in transactions, practices, or courses of business which operated as a fraud or deceit upon the purchasers of such securities.

85.    By reason of the conduct described above, Alomari and MCM Consulting violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder

86.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-82 above.

87.    By reason of the foregoing, each of Alomari and MCM Consulting, directly or indirectly, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the means or instrumentalities of interstate commerce or the facilities of a national securities exchange or the mail: (a) has employed or is employing devices, schemes, or artifices to defraud; (b) has made or is making untrue statements of material fact or has omitted to state material fact(s) necessary to make the statements made not misleading; and (c) has engaged or is engaging in acts, practices, or courses of business which operate as a fraud or deceit upon certain persons.

88.    By engaging in the conduct described above, Alomari and MCM Consulting violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

### Violations of Section 17(b) of the Securities Act

89.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-82 above.

90.    By virtue of the foregoing, each of Alomari and MCM Consulting made use of the means and instruments of transportation or communication in interstate commerce or of the mails to publish, give publicity to, or circulate a notice, circular, advertisement, newspaper, article, letter, investment service, or communication which, though not purporting to offer a security for sale, describes such security for a consideration received or to be received, directly

or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether past or prospective, of such consideration and the amount thereof.

91.    By reason of the conduct described above, Alomari and MCM Consulting violated and, unless enjoined will continue to violate, Section 17(b) of the Securities Act [15 U.S.C. §§ 77q(b)].

## FOURTH CLAIM FOR RELIEF

### Violations of Sections 5(a) and 5(c) of the Securities Act

92.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-82 above.

93.    Each of Alomari and MCM Consulting, directly or indirectly, has made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, when no registration statement was in effect with the Commission as to such securities, and has made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell such securities when no registration statement had been filed with the Commission as to such securities.

94.    By reason of the foregoing, Defendants violated, and unless restrained and enjoined will continue to violate Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a), (c)].

## FIFTH CLAIM FOR RELIEF

### Violations of Section 20(b) of the Exchange Act

95.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-82 above.

96.    From no later than October 2019 through March 2020, Alomari's wife, whom Alomari named as the sole officer and director of MCM Consulting, directly or indirectly

violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) thereunder, 17 C.F.R. § 240.10b-5(b).

97.    From no later than October 2019 through March 2020, Alomari, directly or indirectly, through his wife, did acts or things which it would have been unlawful for him to do under the provisions of the Exchange Act and the rules and regulations set forth above.

98.    By reason of the foregoing, Alomari violated, and, unless enjoined, will continue to violate, Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)].

## **RELIEF REQUESTED**

WHEREFORE, the Commission requests that this Court find Alomari and MCM Consulting committed the violations alleged, and:

A.    Issue a permanent injunction prohibiting Alomari and MCM Consulting from violating Sections 5(a), 5(c), 17(a), and 17(b) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), 77q(a), 77q(b)  and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and prohibiting Alomari from violating Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)].

B.    Issue an Order directing Alomari and MCM Consulting to disgorge all ill-gotten gains or proceeds received as a result of the acts and/or courses of conduct complained of herein, with prejudgment interest thereon.

C.    Issue an Order directing Alomari and MCM Consulting to pay a civil money penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

D.    Issue an Order prohibiting Alomari and MCM Consulting pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6)(A) of the Exchange Act [15 U.S.C. § 78u(d)(6)(A)] from participating in an offering of penny stock, including engaging in

activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.

      E.      Enter a Final Judgment barring Alomari pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act.

      F.      Grant such other and further relief as may be necessary and appropriate.

      G.      Further, the Commission respectfully requests that the Court retain jurisdiction over this action in order to implement and carry out the terms of all orders and decrees that it may enter, or to entertain any suitable application or motion by the Commission for additional relief within the jurisdiction of this Court.

## JURY DEMAND

The Commission demands a jury in this matter for all claims so triable.

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

By its attorneys,

/s/Richard M. Harper II_____
Richard M. Harper II
Jeffrey T. Cook
Alexandra B. Lavin
Jonathan T. Menitove
Boston Regional Office
33 Arch Street, 24th Floor
Boston, MA 02110
(617) 573-8979 (Harper)
HarperR@sec.gov

Dated: May 3, 2024