UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>Plaintiff,<br><br>v.<br><br>AHMED ALOMARI and MCM CONSULTING,<br>Defendants. | C.A. No. 24-cv-172-JJM-LDA |

**ORDER**

The Securities and Exchange Commission ("SEC") filed suit against Ahmed Alomari and MCM Consulting ("MCM") for violating the Securities and Exchange Act while promoting stocks. SEC alleges that Mr. Alomari and MCM, the entity through which he operates his business and holds his personal investments, fraudulently recommended stocks while selling the same stocks without adequately disclosing the intent to sell, and committed other fraudulent acts related to his stock promotion services. Defendants move to dismiss Counts I (for violating Section 17(a)), II (for violating Section 10(b)), and V (for violating Section 20(b)) of the Amended Complaint. ECF No. 19. Because the Court finds that the SEC has stated claims for relief, it DENIES Defendants' motion.

I. **BACKGROUND**

Mr. Alomari is a marketer with millions of followers on social media. Some microcap companies pay stock promoters to recommend or "tout" stock in unsolicited electronic communications, such as emails, texts, social media posts, or internet

chatrooms. Federal securities laws require the publishers of those communications to disclose who paid them for the promotion, the amount, and the type of payment.

Mr. Alomari began promoting stocks in 2019, using his social media accounts on Twitter, Instagram, and Facebook, message boards such as Investors Underground, and third-party text messaging service. He conducted his business activities under MCM, of which he was a 100% owner. His wife was the sole officer and director of MCM even though she was not involved in the business. Mr. Alomari purported to be just an "authorized signer" for his wife's entity, but he actually controlled all MCM's operations and transactions.

Five companies hired Mr. Alomari to promote their stocks, although only three, Soliton, Inc., Volcon, and EBET, Inc., are relevant to the SEC's motion. Kevan Casey and Adrian James, who knew Mr. Alomari and were involved with the companies, arranged these deals. Mr. Alomari was paid cash or issued company securities through a written contract in exchange for his promotional services. When he promoted the stocks on these various platforms, he did not disclose or fully disclose that he was compensated for that work.

EBET hired Mr. Alomari to promote its stock for six months and paid him 50,000 restricted[1] shares. In exchange, Mr. Alomari posted on various social media

---

[1] Securities acquired directly or indirectly from a company that issues stock in a transaction, or a chain of transactions, which does not involve a public offering is considered "restricted." These stocks are considered "restricted" as they typically have conditions about the timing of their sale or transfer during a vesting period. The restrictions are intended to discourage premature selling that might negatively affect the company.

platforms before the Initial Public Offering ("IPO") to boost the stock. He later spent $200,000 on his own to subscribe to 33,333 shares in the IPO. These shares, unlike the restricted shares, could be sold at prevailing market prices when the IPO was launched. On the first day of public trading, Mr. Alomari sold all 33,333 shares plus another 6,549 shares he bought on the day of the IPO. As he was promoting EBET stock and encouraging investors to buy it, he was selling his own stock at a profit of $942,500. He did not disclose to his social media following in any of his posts that he intended to sell the stock. His Twitter profile generally stated: "Make your OWN trading decisions. I could be buying or selling any stocks mentioned."

Another company, Volcon paid Mr. Alomari 75,000 shares to promote its stock. It also provided him the ability to purchase 7,752 Volcon shares for $0.01 in exchange for his promotional services six-months post-IPO. On his own, Mr. Alomari paid $720,000 to subscribe to 130,909 shares in the Volcon IPO. He again vigorously promoted Volcon stock leading up to the IPO, told his followers that he was going to invest in Volcon when he separately communicated that he only planned to hold the stock for one to five days. For the two weeks following the IPO, while he continued to promote Volcon stock as a good buy, Mr. Alomari sold all his shares for a $478,000 profit. He did not disclose that he intended to and did sell his own stock.

Soliton engaged Mr. Alomari to promote its stock in exchange for 25,000 shares. Because those shares came directly from Soliton, they were restricted securities subject to holding period requirements, i.e., they could not be sold for six months to a year. Mr. Alomari needed the funds immediately, however, so he

3

convinced Messrs. Casey and James to transfer 22,000 unrestricted shares to him in exchange for his transfer of the right to acquire his restricted 25,000 shares six months later at $0.05. He sold the 22,000 shares immediately for $400,000.

Mr. Casey, on Soliton's behalf, approached Mr. Alomari for additional promotion work two months later. Mr. Alomari sought additional compensation; he wanted the 25,000 restricted shares back from Messrs. Casey and James and they agreed. Mr. Alomari promoted the Soliton stock for a few months and then decided that he wanted to deposit and publicly sell the 25,000 shares. They were still restricted so Mr. Alomari needed to provide the transfer agent a letter indicating that the shares were eligible for public trading. Mr. Alomari applied his wife's signature to four shareholder representation letters that falsely stated that the shares were fully paid and at least six months elapsed since they were acquired. Soliton released the shares; Mr. Alomari deposited them in an MCM brokerage account and immediately sold them.

SEC brings five[2] claims against Defendants but only three are the subject of Defendants' motion to dismiss. They are for securities fraud in violation of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 for recommending stock purchases while failing to adequately disclose they were selling the same stocks and creating and submitting false representation letters; and for a

---

[2] The remaining two claims are for promoting certain microcap stocks without fully disclosing that Defendants were compensated for those promotions or the amount in violation of Section 17(b) of the Exchange Act (Count III) and offering and selling stock in transactions that were not registered with the Commission in violation of Section 5 of the Securities Act (Count IV).

violation of Section 20(b) of the Exchange Act by acting through his wife to make false statements in representation letters concerning share payments that Mr. Alomari sought to have freed from trading restrictions.

## II.   STANDARD OF REVIEW

To survive a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), a plaintiff must present facts that make her claim plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). To determine plausibility, the Court must first review the complaint and separate conclusory legal allegations from allegations of fact. *See Rodriguez-Reyes v. Molina-Rodriguez*, 711 F.3d 49, 53 (1st Cir. 2013) (citation omitted). Next, the Court must consider whether the remaining factual allegations give rise to a plausible claim of relief. *See id.* (citations omitted).

To state a plausible claim, a complaint need not detail factual allegations, but must recite facts sufficient at least to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" cannot suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Id.* (alteration in original) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 557); *see also Soto-Torres v. Fraticelli*, 654 F.3d 153, 159 (1st Cir. 2011) (internal quotation marks

omitted) (citation omitted) ("[C]ombined allegations, taken as true, must state a plausible, not a merely conceivable, case for relief.").

## III. DISCUSSION

The Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") govern this fraud action. "The text of the statutes confirms their common purpose to prohibit a wide swath of fraudulent behavior that Congress believed impeded the smooth and honest functioning of the securities markets." *SEC v. Tambone*, 550 F.3d 106, 120 (1st Cir. 2008), *reh'g en banc granted, opinion withdrawn*, 573 F.3d 54 (1st Cir. 2009), and *opinion reinstated in part on reh'g*, 597 F.3d 436 (1st Cir. 2010).

The three Counts involved in Mr. Alomari's motion relate to SEC's allegations about his promotion of EBET and Volcon IPOs with intent to sell without appropriate disclosure, his promotion of Soliton and ultimate evasion of the regulations on selling restricted securities, and his use of deceptive devices (letters signed by his wife) to induce the improper issuance of restricted securities. All three involve violations of Sections 10(b) and 17(a) and the 10b-5 regulations and the last one is also a violation of Section 20(b). Defendants claim that Mr. Alomari's promotional activities were lawful and do not amount to fraud under the statutes. The Court will discuss each in turn.

### A.   Counts I & II – Violation of Section 17(a), Section 10(b), and Rule 10-5

Counts I and II are brought under Section 17(a), Section 10(b), and Rule 10b–5. Section 10(b) makes it unlawful "[t]o use or employ, in connection with the

6

purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of [SEC] rules and regulations." 15 U.S.C. § 78j(b). Rule 10b–5, promulgated under Section 10(b), makes it unlawful, in connection with the purchase or sale of any security:

> (a) To employ any device, scheme, or artifice to defraud,
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

17 C.F.R. § 240.10b-5. To establish a violation of Section 10(b) and Rule 10b–5, a plaintiff must prove that the defendant (1) "made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device," (2) "acting with scienter," (3) in connection with the purchase or sale of a security. *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1467 (2d Cir. 1996). "Scienter, as used in connection with the securities fraud statutes, means intent to deceive, manipulate, or defraud, ... or at least knowing misconduct." *Id.* (citations omitted); *SEC v. Fife*, 311 F.3d 1, 9 (1st Cir. 2002). "Whether or not a given intent existed, is ... a question of fact." *First Jersey Sec., Inc.*, 101 F.3d at 1467.

Section 17(a) provides that it is unlawful for any person in the offer or sale of any securities:

> (1) to employ any device, scheme, or artifice to defraud, or
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

7

15 U.S.C. § 77q(a). The elements of a Section 17(a) claim are essentially the same as those under § 10(b) and Rule 10b–5," but "the language of § 17(a) requires scienter under § 17(a)(1), but not under § 17(a)(2) or § 17(a)(3)." *Aaron v. SEC*, 446 U.S. 680, 697 (1980). Because claims brought under these provisions sound in fraud, a plaintiff must state "the circumstances constituting fraud or mistake" with "particularity." Fed. R. Civ. P. 9(b).

### A. Public Promotion of the Purchase of Stock While Failing to Adequately Disclose Selling and Intent to Sell the Same Stock

In moving to dismiss Counts I and II, Mr. Alomari argues that the SEC's allegations do not establish that he had a duty to investors, the SEC does not allege the required element of scienter, and even if the Amended Complaint was adequate as to the former, the omissions the SEC alleges were not material. The SEC counters that in his promotion of the EBET and Volcon IPOs, Mr. Alomari intended to and did sell huge quantities of shares during or immediately after the IPOs generating huge profits without adequately disclosing his intent to sell. The SEC argues that he orchestrated deceptive letters through his wife's signature and then used those letters to evade the legal requirements of restricted stock.

The SEC alleges that none of Mr. Alomari's promotions of EBET or Volcon disclosed his compensation or any relationship he had with the company. ECF No. 17 ¶ 46. Mr. Alomari attempted to convince investors that the share prices for the stocks he was promoting were going to increase and doubled down on this assertion by telling them that he was also investing in the stock. For example, on the first day of

public trading in the EBET IPO, Mr. Alomari posted several times that he was buying shares and, throughout the day, compared EBET to another issuer, UTME, which launched a very successful and lucrative IPO the week before. *Id.* ¶¶ 51-52. That very day, Mr. Alomari did the opposite of what he recommended to his followers–he sold all his IPO shares, which dwarfed his purported buying activity, and made a $942,500 profit. *Id.* ¶ 53. He did the same thing on the morning of the Volcon IPO. Mr. Alomari touted the company's shares on Investors Underground, claiming "Let [the IPO investors] dump their shares . . . accumulate is my plan . . . Soon as they are done [in my opinion] VLCN is going to rip hard." *Id.* ¶ 58. He did not disclose his actual thinking and plan, which was to hold the shares for only a few days and then sell. *Id.* ¶ 57. From the first day of the IPO through October 19, 2021, while he continued to post positive Volcon news about the stock hitting new daily highs, *id.* ¶¶ 59-60, Mr. Alomari did the opposite of accumulating–he sold all his IPO shares for a profit of $478,000. *Id.* ¶ 60. These allegations plausibly state a claim.

SEC also alleges that Mr. Alomari violated Section 10(b) and Rule 10-b-5(a) and (c) because he employed a deceptive device to defraud investors. In this case, the deceptive devices are the letters he had his wife sign to avoid having to hold restricted shares for six months before he could sell them. Because he wanted to sell them immediately, Mr. Alomari installed his wife as MCM's sole corporate officer with the only function of signing or allowing her signature to be applied to documents. *Id.* ¶¶ 9, 29. He then arranged to apply her signature to four different shareholder representation letters that falsely stated that MCM had "fully paid" for the shares for

which it was seeking issuance without restriction. *Id.* ¶ 80. Mr. Alomari then distributed these fraudulent letters to intermediaries in the chain of distribution to induce the issuance of the shares without restriction and the deposit of those shares into brokerage accounts. *Id.*, ¶¶ 81-84. These alleged acts using deceptive devices to induce improper issuance of restricted securities are more than enough to state claims of fraud under Rule 10b-5(a) and (c).

In the face of these plausible allegations of securities fraud, Mr. Alomari argues that the Amended Complaint fails to allege he had a fiduciary-like relationship with investors such that a duty would attach. And he further asserts that because he had a generic disclaimer on Twitter, "Make your own trading decisions. I could be buying or selling any stocks mentioned[]," anyone who came upon his posts would know he could potentially be invested in the stocks he promoted. But "[w]hen a corporation does make a disclosure—whether it be voluntary or required—there is a duty to make it complete and accurate." *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 26 (1st Cir. 1987). And the SEC has effectively alleged that Mr. Alomari had a duty to disclose that he intended to profit by selling the stocks he promoted and that he failed to do so. This is information that investors would want to know before they invested in the same stocks a promoter was promoting.

Mr. Alomari also argues that the SEC's claims fail because it did not adequately plead scienter. To show scienter, the plaintiff must show that the defendants acted with a high degree of recklessness or consciously intended to defraud. *SEC v. Ficken*, 546 F.3d 45, 47 (1st Cir. 2008). "Recklessness is 'a highly

10

unreasonable omission, involving not merely simple, or even inexcusable [] negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious the actor must have been aware of it.'" *Id.* at 47-48 (quoting *Greebel v. FTP Software*, 194 F.3d 185, 198 (1st Cir. 1999)). At the pleading stage, "a defendant's publication of statements when that defendant 'knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter.'" *SEC v. Johnston*, 986 F.3d 63, 74 (1st Cir. 2021) (quoting *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir. 2002)).

As to scienter, SEC alleges Mr. Alomari's intent to deceive is evident from the timing of his selling during or immediately following their promotions. *See SEC v. Recycle Tech, Inc.*, 2013 WL 12063952, at *6 (S.D. Fla. Sept. 26, 2013) (scienter is found where a defendant sells stock when it recommends that investors buy it). The timing of his promotion of and intention to purchase Volcon stock, the Volcon IPO, and his private email on the day before the Volcon IPO that he was not in on Volcon for the duration and intended to sell the shares within one to five days, ECF No. 17 ¶¶ 57, 60, strongly suggest Mr. Alomari's alleged intent to sell his IPO shares, which he did, and knowledge of wrongdoing.

The Court also finds that the SEC's allegations satisfy Rule 9(b) in that they plead each instance of this fraud with particularity, giving the time, place, and manner of Mr. Alomari's promotions and selling activity. *See id.* ¶¶ 51-60. These assertions are sufficient to plausibly allege, for purposes of § 10(b) and § 17(a) of

11

the Securities Act, and therefore, also, Rule 10b-5, that Mr. Alomari was an active and knowing participant in, and made material misrepresentations in furtherance of, the alleged fraudulent scheme. The Court denies Mr. Alomari's Motion to Dismiss Counts I and II.

### B. Count V – Violation of Section 20(b)

The SEC claims that Mr. Alomari violated Section 20(b) of the Exchange Act when he made false statements in representation letters that his wife signed concerning the payment for shares that he sought to free from trading restrictions. Mr. Alomari moves to dismiss this claim, arguing that the statute requires proof that his wife independently violated the law and that he exercised control over her. The SEC counters that Mr. Alomari's motion should be denied because Section 20(b) can be violated by or through an innocent person and a claim is stated where it is alleged that a violator used a third person to do things that would have been illegal for the violator to do. The SEC also argues that it does not have to allege control.

In interpreting a statute, the Court begins with the text. *In re BankVest Cap. Corp.*, 360 F.3d 291, 296 (1st Cir. 2004). The Court "assume[s] that the words Congress chose, if not specially defined, carry their plain and ordinary meaning." *In re Hill*, 562 F.3d 29, 32 (1st Cir. 2009) (citing *Boivin v. Black*, 225 F.3d 36, 40 (1st Cir. 2000)). "If that meaning produces a plausible (though not inevitable) result, that is generally the end of the matter." *In re Hill*, 562 F.3d at 32 (citing *Plumley v. S. Container, Inc.*, 303 F.3d 364, 369 (1st Cir. 2002)). The Court now turns to the statutory section at hand.

Section 20(b) of the Exchange Act provides: "It shall be unlawful for any person, directly or indirectly, to do any act or thing which it would be unlawful for such person to do under the provisions of this title or any rule or regulation thereunder through or by means of any other person." 15 U.S.C. § 78t(b). The statute does not specify a requirement that the third party has affirmatively committed a fraudulent act or that the violator has exercised control over the third party. The statutory language is plain in that it focuses on and governs how the violator uses the third party to violate the law. In the prior section, the Court highlighted the SEC's plausible allegations in the Amended Complaint identifying Mr. Alomari's false statements in representation letters on which he acted unlawfully by fixing his wife's signature. Because it also finds that these allegations state a claim under Section 20(b) through his wife, Mr. Alomari's Motion to Dismiss Count V is denied.

## IV. CONCLUSION

For the reasons stated in this Order, the Court finds that the SEC's Amended Complaint states claims under Sections 10(b), 17(a), and 20(a) of the Securities and Exchange Acts and Rule 10b-5 arising from Mr. Alomari's promotion and sale of securities. The Court DENIES Defendants' Motion to Dismiss. ECF No. 19.

IT IS SO ORDERED.

_____
John J. McConnell, Jr.
Chief United States District Judge

December 20, 2024